JUAN VALLDEJULI RODRÍGUEZ and JUANITA P. VALLDEJULI, Plaintiffs and Appellants, *v.* AQUEDUCT AND SEWER AUTHORITY OF THE COMMONWEALTH OF PUERTO RICO ET AL., Defendants and Appellees.

No. R-66-289.      Decided May 11, 1971.

*Guillermo Cintrón Ayuso* and *José F. Quetglas Álvarez* for appellants. *González & Rodríguez* for appellees.

PER CURIAM: Appellant, plaintiff in the original complaint, claimed compensation for mental anguish and physical sufferings and for expenses allegedly incurred as a result of a fall which he suffered on September 19, 1963, around 1:00 to 1:15 in the afternoon when he slipped near a sewer on Comercio Street, San Juan. He alleged in his complaint that when he fell on the pavement his whole suit and body became dirty from the fecal matter and sewage which came out from the sewer system, which had overflowed on account of the torrential rains which had fallen on that day, suffering, also, bruises on different parts of his body, and that he developed an umbilical hernia which required surgery for its restoration. He requested a compensation of $88,500 which he reduced afterwards to $38,500, when he desisted during the trial from the item of $50,000 for damages sustained by his wife.

The Superior Court granted the complaint based on the joint negligence of the Aqueduct Authority and the Govern-

ment of the Capital, attributable to its insurer, appellee herein, fixing appellant's damages in the amount of $500.

The principal contention in the appeal relies on the assigned error of the trial court in concluding that plaintiff's hernia was not produced by the fall which the latter suffered on the day of the accident, but even if it were so, the compensation of $500 for damages and $100 for attorney's fees is exceedingly unfair and inadequate considering the proven damages.

The Superior Court received the testimony of two surgeons. The first, Dr. José Noya Benítez, testified that he examined appellant on the day following the accident; that he presented "a swelling in the umbilical region, small, but that when he made an effort or coughed, it grew in size" (Tr. Ev. 14). He diagnosed the condition as "an umbilical hernia recently acquired or developed" recommending that the patient be operated on to correct the defect (Tr. Ev. 15). Dr. Noya performed the operation. There were no complications of any kind and the patient was discharged from the hospital seven days later (Tr. Ev. 16). In his testimony, Dr. Noya testified that he arrived at the conclusion that the hernia had been caused by the trauma of the fall. He grounded this opinion solely on the history given to him by the patient denying having felt ". . . anything or having had any indisposition or any swelling in that area" (Tr. Ev. 18) previously. He also testified, that from the examination and operation which he performed he could not determine whether the hernia had been caused by the accident (Tr. Ev. 37).

Basically the trial court understood that it had to decide a problem of causality. In other words, whether a causal relationship existed between the effort of the fall and the umbilical hernia which appellant developed.

The Superior Court adjudged this question adverse to the view of plaintiff's physician. It decided that plaintiff's hernia was not produced by the fall which he suffered. The

court accepted the opinion of the medical expert Dr. Alfredo D'axtmayer relying on the same and on other authorities in the matter which it cited to adjudicate the controversy.

The reading of the testimonies of the physicians should not leave any doubt that the testimony of Dr. D'axtmayer against Dr. Noya's did not raise a conflict about the question of causality. Doctor D'axtmayer examined appellant two years after the operation. He testified that on the date of said examination "the only thing" he presented "was a scar about three inches long, transversally oriented, below the navel (Tr. Ev. 61) ; and that on that date he could not determine "whether there was a hernia, and I can determine even less what kind of hernia, I did not see him with the hernia" (Tr. Ev. 71).

Doctor D'axtmayer's testimony technically could not, therefore, be used to support the determination of the court to the effect that ". . . plaintiff's hernia was *not* produced by the fall which he suffered on the day before his operation." (Finding of Fact No. 11, italics ours.)

Placed in perspective, the scope of Dr. D'axtmayer's testimony was, in our judgment, to raise a controversy about sufficiency of evidence to reach a determined medical conclusion rather than a conflict of evidence about the question of causality. On the one hand Dr. Noya had testified, as we have seen, that his conclusion that the hernia had been caused by the trauma of the fall was based *solely* on the history which the patient gave him, and also, that on the grounds of the examination and operation which he performed he could *not* determine whether the hernia had been caused by the accident.

Doctor D'axtmayer, on the other hand, was emphatic in his opinion. The *findings* in the operation are more objective, in his judgment, than the *history* and that if those findings were not present he would say that the hernia was not traumatic (Tr. Ev. 64–69). Further on, answering questions of

the judge, he explained why, in his judgment, a conclusion that the hernia was traumatic based solely on the patient's history cannot be reached. The doctor explained that when an operation is performed "there has to be something in the tissues, hemorrhage or something . . . some finding." (Tr. Ev. 84.)

"A—That is, the tissues of the abdominal wall indicate, whether in the navel or wherever it is . . . if a person receives an injury, trauma or contusion or if there is any tearing, the capillaries or small veins have to rupture, there has to be hemorrhage, it must have left a hemorrhage, small or big, but it must have left a hemorrhage, not like when one makes an incision that the blood is fresh and red, but two days later it is a little bit old, already dark blood, maybe coagulated, blotting the tissues, and that creates, produces inflammation, or a reaction in the tissues which are not normal any more, besides there being a hernia.

Q—If a person falls, a great fall, and falls in a sitting position or sideways and there is no hemorrhage, you do not agree?

A—Then the hernia is not caused by the fall, if those findings are not present." (Tr. Ev. 85.)

■ In our opinion, the key question raised by Dr. D'axtmayer's testimony centered about the *sufficiency* of the medical evidence introduced by appellant to establish the relationship of cause and effect between the sudden effort of the latter in falling and the appearance of the hernia. But the fact that the judge placed the controversy beyond said ambit is not by itself decisive to the solution of this appeal, nor demands a different result from that evidenced by the judgment appealed from.

■ It is known that the trial courts, as well as this Court, in the exercise of their reviewing power, have ample discretion in the weighing of expert testimony, being able even to adopt their own view in the weighing or evaluation of the same or to reject it even though it turns out to be technically correct. *Prieto* v. *Maryland Casualty Co.*, 98

P.R.R. 583 (1970) ; *Concepción Guzmán* v. *Water Resources Authority*, 92 P.R.R. 473 (1965).

■ For appellant the sudden effort of his fall and the umbilical hernia which he developed were not disassociated facts. The history which he submitted to the physician and on which the latter based his opinion was to the effect that until the time of the fall he had never had an indisposition or swelling in that region. Therefore, it was natural that appellant excluded from his mind any other possibility as, for example, the possibility of an unnoticed, or even an incipient hernia, but noticed it immediately after the fall. It was within the narrow frame of that history that the physician based his opinion. The physician limited the bases of his expert opinion. He understood, perhaps with some logical sense, that the hernia, according to the history, had occurred so suddenly that it did not warrant any other conclusion but that of traumatic origin. In the absence of any other evidence in the record to indicate the probability of a relationship of causality it does not seem to us that, in justice, we should disturb the adjudication of the trial court. The conclusion of appellant's medical expert situated, as it was, within the limited frame of the patient's history, irrespective of its relevancy or usefulness, precludes us from accepting a possible theory of compensability based on precipitation, aggravation or acceleration of the hernia. Such theory was not justified either by the allegations or by the medical testimony that the trial court had for consideration.

On the other hand the trial court decided that, evidence of trauma not having been established, the hernia for which plaintiff was operated on was not produced by the fall which he suffered. To reach this conclusion, it relied on the expert opinion of Dr. D'axtmayer to the effect that the trauma should have been revealed by findings of rupture of capillaries or small veins, hemorrhage, small or big, and inflammation. The court held that the opinion of Dr. D'axtmayer was more

correct and is supported by several medical authorities which were cited.[1]

We have read other medical authorities about the topic in question which corroborate the conclusion of the trial court.[2]

[1] Marshal Houts, Courtroom Medicine (Matthew Bender & Company, 1960), at Chapter 16, p. 203, Dr. David Woolfolk Barrow of Wisconsin says about this the following:

"Should swelling and bleeding into the tissues be found at operation it is reasonably certain that the hernia is of recent origin."

Further on, on the same page and in Table 1, it is stated that in the operation of recent hernias objective signs of acute trauma, edema, or hemorrhage should be found and that the hernia is not of recent origin if these findings are not found.

McBride, Disability Evaluation 604, 4th ed. (J. P. Lippincott Company), Dr. Earl D. McBride states about the findings in the operation:

"When the operation is undertaken shortly after injury there should be some signs of recent traumatic changes, such as edema or adhesions in the fascia. If a truss has been worn for several weeks, such signs will be masked. Other signs of recent occurrence are immature fibrous bands in the sac, incarceration of abdominal fat which is only slightly adherent to the peritoneal lining and finding of recent hemorrhage or newly formed fibrous tissue on microscopic examination of the tissues. An acute strangulation usually can be quite easily traced to date of injury. Dense adhesions and a thick sac extending down to the testicle would indicate a very old condition."

[2] See: Kessler, Accidental Injuries, The Medico Legal Aspects of Workmen's Compensation and Public Liability, Second Ed., Lea & Febiger, Philadelphia, Chapter XIII, p. 424. About the topic of clinical observations of hernia Dr. Henry H. Kessler, Medical Director of the Rehabilitation Clinic of New Jersey states: "Where an opportunity is afforded through operative measures to study the clinical pathology of the hernia, some degree of accuracy can be attained in reaching a decision. This is not so easily determined by clinical examination."

4-5 Nichols, Trauma 26–27, Feb. 1963 (Matthew Bender & Company) sets forth several findings which should be revealed in order to determine whether a hernia is of traumatic origin, among others, operative findings:

"The operative findings must be consistent with a recent traumatic injury. Thus, if the hernia is recent—a week old or less—one should find corroborative evidence at the operating table. There should be some extraordinary finding, such as an organized hemorrhage or an exudate, a tearing of the peritoneum, an inflamed edematous sac, or some such evidence of recent injury.

"Moorhead states that he has operated on several so-called traumatic hernias, as early as a few hours after the alleged onset, but has never found the slightest evidence of recent pathology. He has come to the conclusion that hernias are not connected with injuries except under the most unusual circumstances."

The impression which we have received from this reading is to the effect that the so-called traumatic hernia is the exception. For example in the *Tratado de Medicina Legal*, Editorial Saber, Valencia, Spain, at p. 542, it is said:

"Clinic as well as experimentation has led to a unanimous conclusion: the formation of a hernia is slow, it is the work of days and days, is caused by the effect of multiple efforts, the majority of them of a slight entity, and even proper of the ordinary activities of life. The peritoneum may, when enlarging, tear or explode; the glove finger which molds the intestine or contains epiploon may never be formed by virtue of only one effort and as by an act of magic or prestidigitation. This undeniable and evident fact is fundamental. It leads us to conclude that the hernia by effort is so exceptional that it may be considered as nonexistent. All hernias, therefore, are caused by weakness; if one results *apparently* originated by an effort, what in reality is involved is the occupation for the first time of a preformed sac, or rather the appearance of pain in a hernia which had been unnoticed.

"The only and proper hernia of effort, produced in a sudden manner as a result of an effort, is the one originated by the rupture of the parietal peritoneum due to the sudden enlargement of the same. This, besides being a very rare fact, does not constitute a hernia in the medical sense of the word."

█ In his third assignment of error appellant shows his disagreement with the amount fixed as compensation for physical damages consisting of contusions in several parts of the body and the experience of having become dirty from mud and fecal matter which spouted from the sewer system suffered on falling. Although reasonable minds may differ as to the amount fixed as compensation by the trial court in this case, we do not believe that the same is so unreasonably low to justify our intervention to raise it.

The judgment rendered on August 31, 1966, by the Superior Court, San Juan Part, will be affirmed.

Mr. Justice Dávila did not participate herein.